## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| FRIENDS OF MERRYMEETING BAY<br><br>Plaintiffs,<br><br>vs.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, an agency of the United States;<br><br>&<br><br>MAINE BOARD OF ENVIRONMENTAL PROTECTION, an agency of the State of Maine; MAINE DEPARTMENT OF ENVIRONMENTAL PROTECTION, an agency of the State of Maine; MELANIE LOYZIM in her official capacity as Commissioner of the Maine Department of Environmental Protection<br><br>Defendants. | Civil Action No.: _____<br><br>**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## INTRODUCTION

1.      Plaintiff Friends of Merrymeeting Bay ("**FOMB**"), through this action, alleges that the U.S. Environmental Protection Agency ("**EPA**") abused its discretion under the Federal Water Pollution Control Act ("**Clean Water Act**" or "**CWA**") in failing to reject Maine's unlawful and uncodified actual antidegradation policy. Likewise, FOMB also challenges the Maine Board of Environmental Protection's ("**BEP**") unlawful failure to exercise its nondiscretionary duty to recommend the reclassification of a segment of the Androscoggin River to reflect the actual quality of the water. EPA, BEP, and Maine Department of Environmental Protection ("**DEP**") have, erroneously under the law, ignored or not acted properly upon,

1

voluminous water quality sampling demonstrating the actual quality of the water in the Androscoggin River, and a statutory mandate to reclassify the water body based upon that actual quality, and instead defined the "actual quality" of the waters of the state using a modeled unlikely worst case scenario "critical water quality conditions" of simultaneous maximum licensed pollution discharge  levels during low flow and high water temperatures—a "Trifecta of Horribles" never shown to occur in actual fact.

2.        The Clean Water Act was enacted to *restore* and maintain the integrity of our Nation's waters. The CWA restores waters through its requirements to protect the existing quality of water and reduce the discharge of pollutants. The requirement to protect the existing quality of water is achieved through classification of uses based upon the actual quality of the waters, a continuous improvement of pollution control technology, and prevention of backsliding to worse water quality. These requirements work in conjunction to "ratchet up" the quality of waters, locking in any *improvements* to the quality of water that result from reducing the discharge of pollutants.

3.        Plaintiff files this Complaint seeking a declaration that the State of Maine's antidegradation implementation methods relying upon modeling of unrealized scenarios rather than actual quality of water are inconsistent with the minimum requirements of the CWA and the state's codified antidegradation policy. Plaintiff further seeks to enjoin the EPA from failing to exercise its discretion or abusing its discretion and acting contrary to law in violation of the Administrative Procedures Act ("APA"), 5 U.S.C. § 501 et seq., when the EPA failed to ensure the antidegradation implementation methods actually used by Maine are consistent with the state's codified antidegradation policy and the CWA. Plaintiff also files this complaint to enjoin the DEP, Commissioner of the DEP, and BEP to recommend reclassification of the Upper Lower

**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

Segment of the Androscoggin River between Worumbo and Gulf Island Pond dams from antidegradation Class C to Class B to the Maine Legislature in accordance with the Maine Protection and Improvement of Waters Act ("**Maine Waters Act**"), 38 M.R.S. § 361-A et seq., and the Maine Administrative Procedures Act ("**MAPA**"), 5 M.R.S. § 11001 et seq.

JURISDICTION AND VENUE

4.      This Court has jurisdiction over claims against the EPA pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. §§ 2201, 2202 (declaratory judgment and injunctive relief), and 5 U.S.C. § 701 et seq. (the federal Administrative Procedures Act).

5.      This Court has jurisdiction over claims against the DEP, the Commissioner of the DEP, and the BEP pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction). The federal courts have supplemental jurisdiction over claims that arise under state law, including state law authorizing judicial review of agency action, if the claims "derive from a common nucleus of operative fact" as the claims that arise under federal law.

6.      Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because this is an action against an agency of the United States and its officials, a substantial part of the events and omissions giving rise to the claims in this case occurred in this District, and Plaintiff Friends of Merrymeeting Bay resides within the District.

EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.      Plaintiff has exhausted all administrative remedies and has no further administrative resources nor any other adequate remedy in court.

THE PARTIES

8.      Plaintiff Friends of Merrymeeting Bay ("**FOMB**") is a non-profit 501(c)(3) corporation located in Richmond, Maine. Since 1975, FOMB and its members have dedicated

3

**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

themselves to preserving, protecting, and improving the unique ecosystems of Merrymeeting Bay and its watershed, which includes the Androscoggin River.

9. FOMB and its members monitor the chemical and biological water quality of Merrymeeting Bay and its watershed.

10. FOMB and its members have biological, conservation, recreational, aesthetic, and spiritual interests in Merrymeeting Bay and in its tributary, the Androscoggin River, both waters of the United States. FOMB and its members regularly visit, work on, or recreate in and near Merrymeeting Bay and the Androscoggin River and intend to continue to do so regularly in the future.

11. FOMB has been sampling water under EPA or DEP auspices since 1999 and has participated in Maine's Triennial Review of Maine water quality standards and classifications multiple times over the decades.

12. FOMB participated in Maine's 2020-2022 Triennial Review, during which it submitted decades of water quality data and analysis to the DEP and BEP FOMB collected from the Lower Androscoggin River using FOMB's own financial and material resources.

13. FOMB participated in Maine's 2024-2026 Triennial Review, during which it submitted additional data and analysis to the DEP and BEP from water quality samples FOMB collected from the Upper Lower Segment of the Androscoggin River using FOMB's own financial and material resources.

14. The above described biological, conservation, recreational, economic, aesthetic, and spiritual interests of FOMB and its members have been, are being, and, unless the relief prayed for herein is granted, will continue to be adversely affected and irreparably injured by

4
**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

Defendants' actions and inactions in not adequately protecting and maintaining the quality Maine's waters.

15.    The relief sought herein would redress Plaintiff's injuries.

16.    Defendant U.S. Environmental Protection Agency ("**EPA**") is responsible for administering the Federal Water Pollution Control Act, delegating certain parts of its administration to the states, and reviewing state administration for consistency with its minimum requirements.

17.    Defendant Maine Board of Environmental Protection ("**BEP**") is the governing body of the Maine Department of Environmental Protection, an agency of the State of Maine. BEP's purpose is to provide informed, independent and timely decisions on the interpretation, administration, and enforcement of the laws relating to environmental protection and to provide for credible, fair, and responsible public participation in DEP decisions. The Board fulfills its purpose through rulemaking, decisions on selected permit applications, decisions on appeals of the Commissioner of the DEP's licensing actions, review of the Commissioner of the DEP's enforcement actions, and recommending changes in the law to the Legislature. BEP is responsible for administrating portions of the CWA under authority delegated by the EPA. This delegation includes recommending water quality standards to the Maine legislature, monitoring and classifying surface waters, and regulating point and non-point sources of water pollution. It also includes review of recommendations or decisions made by the Commissioner of the DEP.

18.    Maine Department of Environmental Protection ("**DEP**") is the agency of the state of Maine responsible for protecting and restoring Maine's natural resources and enforcing the state's environmental laws, including making water quality classification recommendations to the BEP in connection with the Triennial Review, implementing Maine's antidegradation

5

**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

requirements, and issuing and enforcing the terms of wastewater and stormwater permits, including setting discharge limitations in those permits.

19.     Defendant Melanie Loyzim is the Commissioner of DEP. The Commissioner is the chief administrative officer of the DEP and is responsible for all administrative duties of DEP. The Commissioner is also responsible for making recommendations to the BEP on, among other things, citizen recommendations regarding water quality classification decisions.

## LEGAL BACKGROUND

### I.    Federal Water Pollution Control Act

20.     The Federal Water Pollution Control Act ("**Clean Water Act**" or "**CWA**") was enacted in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this purpose, goals were set to achieve a certain quality in all waters of the United States, prohibit the discharge of toxic pollutants, and to regulate all sources of water pollution.

21.     The CWA, to achieve these goals, requires that states adopt water quality standards to protect and maintain the existing quality of waters. 33 U.S.C. § 1313; 40 C.F.R. §§ 131.10-.12. A water quality standard must consist of three parts: (1) designated uses for each body of water, such as recreational, agricultural, or industrial uses; (2) specific limits on the levels of pollutants necessary to protect those designated uses; and (3) an antidegradation policy designed to protect existing uses and preserve the present condition of the waters.

22.     In determining what constitutes an in-stream water use, which must be protected, the State must consider aquatic life, wildlife, habitat, and the use of the water for recreation, fishing, water supply, and commercial uses—all uses that are enhanced by improved water quality.

**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

23.    "Use of the water body to receive or transport waste water discharges is not considered an existing use" under state law (38 M.R.S. § 464(4)(f)(1)(d)) or federal law, which states "[i]n no case shall a State adopt waste transport or waste assimilation as a designated use for any waters of the United States." 40 C.F.R. § 131.10(a).

24.    States issue National Pollution Discharge Elimination System ("**NPDES**") permits to polluters with 5-year terms and technology forcing conditions intended to ratchet up the quality of the nation's water. NPDES permit limits must not cause violations of water quality standards of the receiving water body to which pollution is discharged.

25.    States must "develop and adopt" an antidegradation policy that, at minimum: (1) maintains and protects "existing uses and the level of water quality necessary to protect existing uses;" (2) maintains and protects the water quality that "exceeds levels necessary to support the protection and propagation of fish, shellfish, and wildlife and recreation in and on the water;" and (3) maintains and protects the water quality of "high quality waters" that constitute "outstanding National resources." 40 C.F.R. § 131.12(a). The CWA further requires that states "shall develop methods for implementing the antidegradation policy" that are consistent with these minimum requirements. 40 C.F.R. § 131.12(b).

26.    The states must review their water quality standards and, as appropriate, revise their standards or adopt new standards. 40 C.F.R. § 131.20(a). This review must happen at least once every three years through a process known as the "Triennial Review." The States must submit the results of their review to the EPA regardless of whether any new or revised standards were adopted. This submission must include, among other materials, "[a]n antidegradation policy consistent with [federal regulations]" and "any general policies applicable to water quality standards." 40 C.F.R. § 131.6(d); 40 C.F.R. § 131.20(c).

**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

27.     The EPA must then review a state's new or revised water quality standards to determine whether they are consistent with the minimum requirements of the CWA. 33 U.S.C. 1313(c); 40 C.F.R. § 131.21(a). The EPA, in its review, must consider "[w]hether the State has adopted an antidegradation policy that is consistent with § 131.12, and whether any State adopted antidegradation implementation methods are consistent with § 131.12." 40 C.F.R. § 131.5(a)(3).

28.     The EPA must promulgate water quality standards in two instances. The first instance is following a state's submission of new or revised standards if the EPA disapproves of the standards and the state subsequently fails to adopt the changes specified in the disapproval. 33 U.S.C. § 1313(c)(4)(A); 40 C.F.R. § 131.22(a). The second instance is "in any case where the [EPA] determines that a revised or new standard is necessary to meet the requirements of the [Act]." 33 U.S.C. 1313(c)(4)(B); 40 C.F.R. § 131.22(b).

## II.     Federal Administrative Procedures Act

29.     Under the APA, agency actions are reviewable. 5 U.S.C. § 706.

30.     Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in the record." 5 U.S.C. § 706(2). An agency action or inaction is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be . . . the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*Motor Vehicles*").

**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

31.     A court must set aside agency action where it is not shown that the agency reviewed the relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *Motor Vehicles* at 59. The agency's failure to do so renders its decision arbitrary and capricious.

32.     The EPA's approval of a state's revised water quality standards is reviewable under the APA.

33.     The EPA's failure to exercise its discretion to determine that a revised or new standard is necessary, upon review of a state's water quality standards—each of which by law includes an antidegradation policy, is also subject to challenge under the APA. This is because the CWA includes goals, substantive priorities, and statutory guidelines for establishing and reviewing water quality standards that limits the EPA's discretion. The EPA's failure to properly exercise its discretion upon review of a state's antidegradation implementation methods, for example, is reviewable under the APA. This is consistent with the cyclical administrative scheme established by the CWA to maintain and restore the nation's waters and the APA, because it prevents the EPA from thwarting the legislative intent by failing to act in any number of circumstances without judicial review.

## III.    Maine Protection and Improvement of Waters Act

34.     The Maine Water Protection and Improvement of Waters Act ("**Maine Waters Act**") was amended in 1985 to ensure its surface water classification system was compliant with the minimum requirements of the CWA. The Maine Legislature, in amending the Maine Waters Act, declared that "it is the State's objective to restore and maintain the chemical, physical and biological integrity of the State's waters and to preserve certain pristine state waters." 38 M.R.S. § 464. The 1985 amendment established a classification system of four antidegradation tiers and water quality requirements for each tier that are still in use today. 38 M.R.S. § 465.

9
**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

35.    The lowest antidegradation tier is Class C surface waters in which some degradation of water quality is allowed but, consistent with federal antidegradation requirements, the existing *uses* of these waters must be maintained and protected. The second and third tiers are Class B and Class A surface waters which are meant to align with the federal "Tier 2" or "high quality" surfaces waters in the federal three-tiered system. In both Class B and Class A surface waters, degradation of water *quality* is not allowed absent findings that degradation is necessary to accommodate important economic or social development.

36.    In Maine, the designated uses for Class B waters are:

> drinking water supply after treatment; fishing; agriculture; recreation in and on the water; industrial process and cooling water supply; hydroelectric power generation, except as prohibited under Title 12, section 403; navigation; and as habitat for fish and other aquatic life. The habitat must be characterized as unimpaired.

38 M.R.S. § 465(3)(A). The criteria necessary to protect these uses of Class B waters consist of numeric criteria for dissolved oxygen ("**DO**"), *Esterichia coli* bacteria ("*E. coli*"), and, now, total phosphorus ("**TP**"), along with narrative "response indicators" for nutrients. 38 M.R.S. § 465(3)(B); 06-096 C.M.R. ch. 583, § 3. The criterion for dissolved oxygen in Class B waters is:

> 7 parts per million or 75% of saturation, whichever is higher, except that for the period from October 1st to May 14th, in order to ensure spawning and egg incubation of indigenous fish species, the 7-day mean dissolved oxygen concentration may not be less than 9.5 parts per million and the one-day minimum dissolved oxygen concentration may not be less than 8.0 parts per million in identified fish spawning areas.

38 M.R.S. § 465(3)(B). The criterion for *E. coli* in Class B waters is:

> Between April 15th and October 31st, the number of Escherichia coli bacteria in these waters may not exceed a geometric mean of 64 CFU or MPN per 100 milliliters over a 90-day interval or 236 CFU or MPN per 100 milliliters in more than 10% of the samples in any 90-day interval.

**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

*Id.* The criterion for TP in Class B waters is that between June and September, TP must be equal to or less than 30 parts per billion (ppb). 06-096 C.M.R. ch. 583, § 3.

37.    Maine's *codified* antidegradation policy is:

> When the actual quality of any classified water exceeds the minimum standards of the next highest classification, that higher water quality must be maintained and protected. Pursuant to subsection 3, paragraph B, the [BEP] shall recommend to the Legislature that that water be reclassified in the next higher classification.

38 M.R.S. § 464(4)(F)(4).

38.    The Maine Legislature has identified the "water quality classification system" as the mechanism which "will allow the State to manage its surface waters so as to protect the quality of those waters." 38 M.R.S. § 464(1). The water quality criteria identified through the classification system are "necessary to protect those uses and related characteristics" and establish the "minimum level of quality which the Legislature intends for the body of water." *Id.*

39.    The State of Maine reviews its surface water classifications and water quality standards through the "Triennial Review" process under 38 M.R.S. § 464(3)(B). Maine's Triennial Review consists of three phases: (1) DEP and the BEP's review and recommendations regarding new or revised standards and classification proposals and evaluations; (2) a legislative phase to approve, deny or modify DEP and the BEP's recommendations; and (3) EPA review and approval or disapproval of the state's adopted new or revised standards and classifications.

IV.    **Maine Administrative Procedures Act**

40.    Under MAPA, state agency action and inaction are reviewable in court. 5 M.R.S. § 11001. Under MAPA, a reviewing court may "reverse or modify" agency "finding, inferences, conclusions or decisions" found to be "[i]n violation of constitutional or statutory provisions" "[i]n excess of the statutory authority of the agency," "[m]ade upon unlawful procedure,"

**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

"[a]ffected by bias or error of law," "[u]nsupported by substantial evidence on the whole record," or "[a]rbitrary or capricious or characterized by abuse of discretion." 5 M.R.S. § 11007(C).

## FACTUAL ALLEGATIONS

### I.    The Androscoggin River

41.    The Androscoggin River is Maine's third largest river, flowing from Umbagog Lake 177 miles downstream to its confluence with the Kennebec River at Merrymeeting Bay. The main stem of the river is currently divided into three segments for purposes of water quality classification: from the Maine-New Hampshire border to the Androscoggin's confluence with the Ellis River—designated antidegradation Class B; from Ellis River to Worumbo Dam in Lisbon Falls—designated antidegradation Class C; and the lowest segment—from Worumbo Dam to the Bath-Brunswick border in Merrymeeting Bay--reclassified from Class C to Class B in 2022. 38 M.R.S. § 467(1). A section from Gulf Island Pond Dam to Worumbo Dam has repeatedly been proposed for reclassification from Class C to Class B, but Maine has never done so. We refer to this Class C section, the subject of this action, as the "**Upper Lower Segment.**"

### II.    The Actual Quality of Water in the Upper Lower Segment.

42.    FOMB has been monitoring the chemical and biological water quality of the Androscoggin for decades, including for the last ten years under the DEP's Volunteer River Monitoring Program ("**VRMP**"). FOMB collected and tested over 200 water samples from ten locations in the Upper Lower Segment during seven sampling events between June and October of 2025, with the results that it submitted to the DEP and BEP showing that the actual quality of the water in the Upper Lower Segment meets antidegradation Class B standards:

- dissolved oxygen (DO) content at every sampling location—all above 7 ppm, except for one instance at one site, which met the alternative saturation minimum;

12
**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

- the geometric mean of *E. coli* concentrations at every sampling location was between 3.6 to 44.6 MPN/ 100 ml; and

- the pH at every sampling location was between 6.5 to 9, DEP's proposed range.

43.    FOMB commissioned a macroinvertebrate aquatic life determination study in 2021 that assessed four sites located in the Upper Lower Segment. The study demonstrated that all three free flowing sites attained Class B standards. The fourth site was located in the upper Worumbo impoundment, and so was not required to meet Class B standards. FOMB submitted this study to the DEP and BEP.

44.    Brookfield White Pine Hydro also collected dissolved oxygen ("**DO**") data during a study in 2022 at two locations in the Upper Lower Segment—one immediately downstream of the Lewiston Falls Dam and another in the Lewiston Falls impoundment. The one downstream site demonstrated water at this location either met or exceeded 7 ppm or 75% saturation at all times except after one August rain event. The impoundment site was Class B compliant in 142 of 147 continuous monitoring profile samples and 100% compliant at depths above 11 meters. Brookfield White Pine Hydro also collected nutrient data from locations within the impoundment upstream of the Lewiston Falls Dam. These data demonstrate water at these locations had less than 30 parts per billion ("ppb") of total phosphorus between June and September.

45.    The BEP and DEP do not dispute the collected data demonstrate the Upper Lower Segment "largely met" the DO criterion and met the *E.coli* criterion for Class B. The BEP and DEP, additionally, concede the quality of water in the Upper Lower Segment exceeds nutrient criteria for Class B.

46.    The BEP and DEP do not dispute the integrity or sufficiency of the data collected by FOMB under EPA or the DEP's protocols.

**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

47.    The BEP does not dispute that Class B designated use criteria under 38 M.R.S. § 465(3) were also met in the Upper Lower Segment of the Androscoggin River.

## III.    The DEP's Implementation of Maine's Antidegradation Policy.

48.    The DEP references its own uncodified "longstanding interpretation" of Maine's statutory antidegradation policy when considering reclassification of waters:

> Where any criterion of water quality (for example, dissolved oxygen, or bacteria, or aquatic life) exceeds the minimum standards of the next highest classification *under critical water quality conditions*, then that higher water quality criterion must be maintained and protected.
>
> Critical water quality conditions include, but are not limited to, conditions of low flow, high water temperature, maximum loading from point source and non-point sources discharges, and conditions of acute and chronic effluent toxicity.

(emphasis added).

49.    The policy language qualifier "under critical water quality conditions" does not appear in the statutory antidegradation policy, which instead requires that segments with "actual quality" exceeding the minimum standards of the next highest classification must be maintained and protected and that, in service of that statutory requirement, BEP "shall" recommend reclassification to the next higher classification to Maine's legislature.

50.    The DEP cannot and has not specified one single instance in which the "Trifecta of Horribles"—critical water quality conditions of maximum loading from all dischargers, minimum flow, and high water temperature—in its "longstanding" but uncodified policy has ever actually occurred concurrently in reality on the Upper Lower Segment.

51.    Water quality that has never been observed cannot constitute the actual quality of a classified water.

14
**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

52.     The DEP referred to its uncodified "interpretation" of Maine's antidegradation policy in its recommendations to the BEP during Maine's 2020-2022 Triennial Review when DEP recommended *not* reclassifying the Androscoggin River from Gulf Island Pond Dam to the Mouth of the River in Merrymeeting Bay from Class C to Class B.

53.     The BEP then failed to recommend reclassifying the segment of the Androscoggin River from Gulf Island Pond Dam to Worumbo Dam to Class B in its final recommendations to the Maine Legislature in January 2021, also citing the uncodified interpretation of Maine's antidegradation policy.

54.     In 2021 the BEP, however, did recommend reclassifying "a more limited downstream stretch of the lower Androscoggin River" from Worumbo Dam to the mouth of the river in Merrymeeting Bay from Class C to Class B.

55.     The 2021 BEP recommendations were enacted in LD 1964 by the Maine Legislature and certified by the Maine Attorney General. The State of Maine then submitted to the EPA for review.

## IV.    The EPA Review of Maine's 2020-2022 Triennial Review.

56.     The EPA subsequently reviewed Maine's submission and approved the new or revised water quality standards, which were based on the uncodified, "Trifecta of Horribles" interpretation of Maine's codified antidegradation policy, by letter dated November 16, 2022. In approving the reclassification of only the more limited downstream stretch of the Androscoggin River, below the Upper Lower Segment, the EPA stated only that: "EPA approves this revision as it affords greater protections to the Class B section of the Androscoggin River."

57.     The EPA, in its approval of the new or revised standards, failed to consider whether Maine's uncodified "interpretation" and antidegradation implementations methods were consistent with the CWA and failed to exercise its discretion to either promulgate or direct the

15
**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

state to promulgate revised or new antidegradation policy to meet the minimum requirements of the CWA.

**V.    The BEP's and DEP's Failure to Recommend Reclassification of the Upper Lower Segment.**

58.    The DEP, during Maine's 2024-2026 Triennial Review, declined to act on actual data demonstrating the actual quality of water in the Upper Lower Segment meets or exceeds the standards for Class B—based upon its conclusion that: "the river cannot meet Class B criteria at all times during critical conditions of high water temperature, low flow, and maximum licensed discharge levels"—the modeled Trifecta of Horribles that comprises the State's apparent actual antidegradation policy in the place of the codified policy. As a result, the DEP failed to recommend reclassifying the Upper Lower Segment in its final recommendations to the BEP.

59.    The BEP failed to include any recommendation to the Maine Legislature to reclassify the Upper Lower Segment of the Androscoggin River to Class B in its final recommendations on January 5, 2026. The BEP, like DEP, relied on the uncodified interpretation of the antidegradation policy as the basis for its failure to act and recommend the reclassification of the Upper Lower Segment, stating that "the river cannot meet Class B DO criteria at all times during critical conditions of high water temperature, low flow, and maximum licensed discharge levels."

60.    DEP controls the licensed discharge levels for NPDES permits and, therefore, the possibility of the Upper Lower Segment ever being eligible for reclassification to Class B under DEP and BEP's uncodified interpretation of Maine's antidegradation policy, regardless of the actual quality of the waters of the Upper Lower Segment.

16

**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

FIRST CAUSE OF ACTION

*CWA, 33 U.S.C. § 1313, APA 5 U.S.C. § 706(2)*

**Against EPA Only**

61.     Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

62.     The EPA, in violation of the CWA and APA, in its review of Maine's 2020-2022 Triennial Review, abused its discretion when it failed to itself promulgate or direct Maine to promulgate a new or revised antidegradation policy to meet the minimum requirements of the CWA.

63.     The EPA's approval of the reclassification of only the lower segment of the Androscoggin River and not the Upper Lower Androscoggin River that resulted from Maine's 2020-2022 Triennial Review violated both the CWA and APA.

64.     Defendant EPA's actions have been arbitrary, capricious, and otherwise not in accordance with applicable law under the APA; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or without observance of procedure required by law.

SECOND CAUSE OF ACTION

*Maine Waters Act, 38 M.R.S. § 464(4)(F)(4), MAPA, 5 M.R.S. §§ 11001(2), 11002(3)*

**Against State of Maine Defendants Only**

65.     Plaintiffs hereby incorporate all previous allegations contained in this Complaint as though fully set forth herein.

66.     The data and analysis presented to the DEP and BEP demonstrate the actual quality of water in the Upper Lower Segment of the Androscoggin River exceeds the standards for Class B waters.

17
**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

67.     Under Maine's codified antidegradation policy implementing the CWA, "when the *actual quality* of any classified water exceeds the minimum standards of the next highest classification, that higher *water quality must* be maintained and protected" and the BEP "*shall* recommend to the Legislature that that water be reclassified in the next higher classification." 38 M.R.S. § 464(4)(F)(4) (emphasis added).

68.     The DEP, BEP, and the Commissioner of the DEP, since at least 2001, in implementation of the Maine Waters Act and the CWA, have and continue to unlawfully rely upon an agency interpretation of Maine's antidegradation policy that is in direct contradiction of the Maine Waters Act's codified antidegradation policy because it ignores the actual quality of the water.

69.     The DEP, BEP, and Commissioner of the DEP violated the law when each failed to recommend reclassification of the Upper Lower Segment of the Androscoggin River to Class B relying on modeled scenarios not existing in reality instead of samples taken in actual conditions to establish the actual quality of the water in the Upper Lower Segment.

70.     DEP, BEP, and the Commissioner of DEP's actions and inactions have been arbitrary, capricious, and otherwise not in accordance with applicable law under the MAPA; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; and/or without observance of procedure required by law.

PRAYER FOR RELIEF

For relief, Plaintiff requests that the Court:

71.     Adjudge and declare that Defendant EPA abused its discretion when it reviewed and approved water quality standards and water body antidegradation classifications, which were based upon Maine's antidegradation modeling of the Trifecta of Horribles instead of upon the codified antidegradation policy's requirement to look at the *actual quality* of Maine's waters

18

**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

necessary for the State of Maine to meet the requirements of the CWA during its review of Maine's 2020-2022 Triennial Review and in doing so, violated the CWA and the APA.

72.     Adjudge and declare Defendants BEP, DEP, and Commissioner of the DEP's antidegradation implementation modeling methods, are not consistent with the minimum requirements of the CWA, and are contrary to Maine's codified antidegradation policy.

73.     Adjudge and declare that Defendant EPA's failure to promulgate revised or new antidegradation implementation methods necessary for the State of Maine to meet the minimum requirements of the CWA violated the CWA and APA.

74.     Adjudge and declare that Defendants DEP, Commissioner of the DEP, and BEP's failure to recommend the reclassification of the Upper Lower Segment—the Androscoggin River from the base of Gulf Island Pond to Worumbo Dam—violates the Maine Waters Act and MAPA.

75.     Adjudge and declare that Defendants DEP, Commissioner of the DEP, and BEP's continued reliance upon the uncodified antidegradation policy which itself relies upon modeling of unrealized scenarios instead of the actual quality of the waters of the state violates the Maine Waters Act and MAPA.

76.     Order Defendant EPA to comply with the CWA and promulgate revised or new antidegradation implementation methods for Maine's waters.

77.     Order Defendants DEP, the Commissioner of the DEP, and BEP to comply with the Maine Waters Act and recommend to the Maine Legislature the reclassification of the Upper Lower Androscoggin River (from Gulf Island Pond Dam to Worumbo Dam) to Class B.

19
**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____

Dated:                                                        Respectfully Submitted,

By: _____               By:   */s/ Rachel S. Doughty*
     Scott L. Sells, Esq.                                   GREENFIRE LAW, PC
     Maine Bar No. 009822                            Rachel S. Doughty
     The Sells Law Firm, LLC                         rdoughty@greenfirelaw.com
     Merrill's Wharf                                        Nathaniel R. Launer
     254 Commercial Street, Suite 245            nlauner@greenfirelaw.com
     Portland, Maine 04101                            2748 Adeline Street, Suite A
     Tele: (207) 523-3477                               Berkeley, California 94703
     E-mail: sls@sellslawfirm.com;                 Telephone: (510) 900-9502

Attorney for Friends of Merrymeeting Bay     *Motions for Pro Hac Vice Pending*

20
**PLAINTIFF'S COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**
Civil Action No.: _____